**Daniel Michael**
**Osman Nawaz***
**Richard Hong**
**William Finkel**
**Joshua Brodsky**
**Attorneys for the Plaintiff**
**SECURITIES AND EXCHANGE COMMISSION**
**New York Regional Office**
**Brookfield Place**
**200 Vesey Street, Suite 400**
**New York, New York 10281-1022**
**(212) 336-0956 (Hong)**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,**<br><br>　　　　　　　　　　　　　　**Plaintiff,**<br><br>　　　　　　-against-<br><br>**CAN CAPITAL, INC.,**<br><br>　　　　　　　　　　　　　　**Defendant.** | **COMPLAINT**<br><br>20 Civ. ___ (    ) |

　　　　　Plaintiff Securities and Exchange Commission (the "Commission"), for its Complaint against defendant CAN Capital, Inc., ("CAN Capital" or the "Defendant") alleges as follows:

## SUMMARY

　　　　　1.　　　This case involves violations of the of the federal securities laws by CAN Capital—a merchant cash advance ("MCA") company and servicing company for small business loans.  In 2014, CAN Capital raised $191 million from investors through the securitization of a revolving pool of CAN Capital's outstanding MCAs and business loans.

　　　　　2.　　　These investors obtained the right to cash flows from the securitized MCAs and business loans.  This securitization offered investors the potential for a steady income stream and it also transferred to investors the risk that accounts would not timely pay or would default.

Consequently, investors relied on CAN Capital to accurately describe how it treated and disclosed non-performing MCAs and business loans and to adhere to practices that were consistent with those descriptions.

3. Although offering and other materials for the securitization disclosed that accounts without payment or remittance for "thirty-two consecutive days" would be declared non-performing and subsequently written-off, this did not always happen. CAN Capital at times granted forbearance from remittance requirements (referred to by CAN Capital's collection group as grace days) to accounts that were unable to make payment and, inconsistent with disclosures, failed to designate as non-performing all accounts that made no payments for thirty-two consecutive days. CAN Capital's use of grace days was important given credit risks associated with such non-performing accounts as well as CAN Capital's obligation to maintain a minimum amount of performing MCAs and business loans in the securitization.

4. CAN Capital used grace days since before the securitization. Over time, however, its use of grace days increased significantly, and by November 2016, CAN Capital's collateral for the securitization contained millions of dollars of non-performing assets that should have been removed from the securitization. This ultimately resulted in an event of default under the securitization due to CAN Capital's failure to satisfy certain credit enhancement requirements designed to limit investor risk, and Class B investors in the securitization ultimately incurred sizable losses.

## VIOLATIONS

5. By virtue of the foregoing conduct and as alleged further herein Defendant violated Sections 17(a)(2) and (3) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)(2) & (3)].

6. Unless Defendant is permanently restrained and enjoined, it will again engage in the transactions, acts, practices, and courses of business set forth in this Complaint or in transactions, acts, practices, and courses of business of similar type and object.

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

7. The Commission brings this action pursuant to authority conferred upon it by Securities Act Section 20(b) [15 U.S.C. § 77t(b)]. The Commission seeks a final judgment permanently enjoining CAN Capital from violating the federal securities laws and rules this Complaint alleges it has violated. While the Commission may seek a final judgment requiring CAN Capital to pay civil money penalties pursuant to Securities Act Section 20(d) [15 U.S.C. § 77t(d)], it does not seek such a judgment in light of CAN Capital's current inability to meet its financial obligations as they become due.

## JURISDICTION AND VENUE

8. This Court has jurisdiction over this action under Securities Act Section 22(a) [15 U.S.C. § 77v(a)].

9. CAN Capital has, directly or indirectly, made use of the means or instrumentalities of interstate commerce or of the mails, in connection with the transactions, acts, practices, and courses of business alleged in this Complaint.

10. Venue lies in this District under Securities Act Section 22(a) [15 US.C. § 77v(a)], During all relevant times, Defendant transacted business in this District, and certain of the acts, practices, transactions, and courses of business alleged in this Complaint occurred within the Southern District of New York, where CAN Capital had its main office during the relevant period.

**DEFENDANT**

11.     **CAN Capital**, Inc. is a Delaware corporation with its headquarters and offices in Kennesaw, Georgia.  CAN Capital, founded in 1998, provides alternative financing for small and mid-size businesses.  CAN Capital has recently experienced significant losses, and is unable to meet its financial obligations as they become due.

**FACTS**

**I.     Background**

**CAN Capital's Business Model and its $191 Million Securitization**

12.     CAN Capital and its affiliates provide small and mid-sized businesses with access to MCAs and loans.  CAN Capital's MCAs are typically made in exchange for daily receipt of a fixed percent of the merchant's daily revenue from credit (and debit) card purchases.  These amounts are, in general, automatically deducted from payments received from card transactions by the merchant's customers.  Therefore every time a merchant generates a receivable involving a credit or debit card, a percentage of that receivable will be remitted to CAN Capital.

13.     To increase its funding, CAN Capital securitized a revolving pool of receivables of MCA remittances and loan payments.  In October 2014, CAN Capital issued, through CAN Capital Funding LLC, a $191 million securitization and conducted a private placement under Rule 144A of the Securities Act.  The securitization included two series of CAN Capital Funding LLC Series 2014-1 notes, $171 million of Class A Senior Notes and $20 million of Class B Subordinated Notes.

14.     The securitization required that CAN Capital submit monthly reports to a trustee for the securitization that the trustee used to keep investors informed of, *inter alia*, the monthly performance of the securitization assets, and whether the performance triggered any defaults in

the securitization.

15. The securitization also contained credit enhancements designed to decrease the risk of investor loss in the event that accounts failed to perform. Such credit enhancements included, among other things, overcollateralization, or a buffer of eligible assets (*i.e.*, performing assets). Specifically, CAN Capital was required to maintain in the securitization (monthly) eligible receivables sufficient to produce overcollateralization of roughly 17% (approximately $30 million) and 4.5% (approximately $10 million) for the Class A and B notes, respectively.

16. With respect to performing assets, securitization offering materials further described CAN Capital's policies and procedures concerning collections and in particular concerning non-performance. The offering materials stated that:

> When a Merchant account goes thirty-two consecutive days with no Loan payment or MCA remittance, as applicable, it is declared "non-performing." Merchant accounts that have been declared Non-Performing are not subject to "re-aging." All Non-Performing Assets are written-off on the last business day of the fourth month after the applicable Merchant account is declared Non-Performing.

17. In other words, when an account went thirty-two consecutive days without any loan payment or MCA remittance, CAN Capital's policies and procedures, as referenced in the offering materials, set forth that CAN Capital was required to declare these accounts as non-performing. As such, the account would not be eligible for the securitization's asset pool.

18. Furthermore, to help ensure that the securitization had properly performing assets, once an account was deemed ineligible for the securitization, the account could never be "re-aged" (*i.e.*, placed back in the securitization asset pool) even if the account commenced timely

payments again.

19.     To maintain the required amount of overcollateralization, CAN Capital would need to replace non-performing MCAs or loans (*i.e.*, ineligible accounts) with new performing MCAs or loans (*i.e.*, eligible accounts) in an amount necessary to meet the overcollateralization tests outlined to investors.  CAN Capital's accurate reporting of ineligible accounts was important to investors because it gave them visibility into the size of the pool of eligible assets in the securitization, as well as the quality of the assets, and thereby enabled investors to monitor CAN Capital's compliance with its obligation to put in additional eligible assets to maintain the minimum amount of overcollateralization required.

20.     At roadshows and various meetings, CAN Capital emphasized to potential and current investors that it had collections policies and procedures that were in place to ensure its compliance with obligations under the offering documents.  For example, in a September 2014 presentation to investors, CAN Capital stated, as shown in the slide below, that accounts are declared non-performing after thirty-two days of non-payment and that "[c]ontracts [are] permanently classified as Non-Performing regardless of amount remitted (i.e., there are no 're-ages') …."

### i. Inconsistent With Disclosures, CAN Capital Granted Grace Days

21.     Since before the securitization, CAN Capital's collection staff granted temporary, short-term forbearance known as grace days to accounts that had not made payments.  Grace days paused the thirty-two consecutive day clock for accounts that did not remit payments.

22.     Moreover, CAN Capital collections staff's use of grace days impacted whether accounts were deemed performing or non-performing.  Specifically, for accounts with grace days, CAN Capital's information systems failed to classify accounts as non-performing even if

payment was not made for thirty-two consecutive days.  Instead, it allowed the account's status to remain as performing for thirty-two days plus the number of grace days provided.

23.     CAN Capital also granted grace days for any account payments made by ACH (Automated Clearing House network).  CAN Capital's information systems automatically provided an additional ten days (beyond the thirty-two consecutive days) to allow for ACH payments to clear.   In other words, CAN Capital's information systems would not designate an ACH account as non-performing unless it went *forty-two* days without a payment (even if the late payment was unrelated to delays in ACH clearing.)  This additional ten day grace period was hard-coded into CAN Capital's systems for all ACH accounts.

24.     None of these grace days practices, and importantly, their impact on the eligibility of assets in the securitization, were disclosed to investors.

25.     Despite detailed awareness of the use of grace days among collections and asset management personnel, as well as management's general awareness, CAN Capital failed to exercise reasonable care to ensure disclosure of its grace days practices.

26.     CAN Capital personnel possessed disparate knowledge and information concerning grace days.  Certain personnel were unaware of how the assets they serviced impacted the securitization, while other personnel were unaware of whether assets in the securitization should have been deemed non-performing.  In addition, certain executives were unaware that grace days stopped the clock for purposes of accounts being removed from the securitization, or that there was, essentially, a forty-two day non-performance test for ACH accounts.

27.     The company lacked processes and procedures and centralization of information concerning grace days.  Moreover, CAN Capital's information systems failed to properly classify

assets, all in relation to the performance of CAN Capital's assets that ultimately impacted the securitization.

28. Investors did not know or have important information concerning CAN Capital's grace day practices. Nor did investors have information that these practices impacted the eligibility of assets for the securitization asset pool. CAN Capital's offering materials and investor presentations concerning collections, non-performance, and re-aging of assets in the securitization of assets that qualified as non-performing were, therefore, materially false and misleading.

### *ii. Over Time CAN Capital Became Increasingly Aware of Grace Day Issues*

29. CAN Capital expanded its business from 2014 through 2016 and began underwriting a greater number of MCAs and loans over time. Late payments also increased.

30. During this period, the collections staff at CAN Capital made increasing use of its practice of extending grace days. In 2015, for example, grace days were granted to accounts totaling roughly $11.8 million, up from approximately $3.4 million in 2014.

31. Throughout 2016, various notices went to management concerning the company's use of grace days including: (i) CAN Capital's external auditor highlighting issues concerning grace days, in the context of loss reserves, as an area of concern that required follow-up; (ii) a February 2016 presentation containing information on a meeting involving CAN Capital's finance personnel and external auditors to "explain the use and impact to NoPo [non-performance] when Grace Days are given;" (iii) a March 2016 finance summary containing information on "collections" and recommending that the company "formaliz[e] our policy around use of <u>partial payments</u> and <u>grace days</u> to keep accounts out of NoPo." (emphasis in original); and (iv) an April 2016 finance summary including a section stating: "Collections--

ensure [] NoPo is not being artificially depressed by use of grace days …."

32. Despite the issues and concerns raised by these materials, CAN Capital did not fully identify or evaluate issues concerning grace days until several months later when a bank that provided a revolving credit facility to CAN Capital found accounts with grace days on its borrowing base that should have been declared non-performing.

### IV. Failure to Satisfy Overcollateralization Test and Rapid Amortization

33. The offering materials for the securitization stated that CAN Capital must provide to the trustee notice of an event of default if, among other things, CAN Capital failed to maintain its overcollateralization requirement. In the event of a default, a rapid amortization would be declared by the trustee or investors in order to facilitate early repayment. Upon the occurrence of a rapid amortization, no new receivables would be pledged to the securitization trust, and all excess cash flows would be utilized to immediately amortize outstanding securitization debt, in order of priority (senior debt first, then subordinate debt).

34. Throughout 2016, CAN Capital struggled to meet the monthly overcollateralization tests designed to maintain certain percentages (roughly 17% or approximately $30 million and 4.5% or approximately $10 million for the Class A and B notes, respectively). In some months, removing even several hundred thousand dollars of eligible assets from the securitization would have put CAN Capital beneath its required overcollateralization requirements.

35. CAN Capital delivered a notice of a rapid amortization event to a trustee for the securitization on November 10, 2016, stating that, in part, it "has discovered . . . that this practice [of grace days] has resulted in the misclassification of certain Assets under the Indenture . . . [CAN Capital] has determined that Assets that have been approved for a grace period should in

most cases be classified as either [] Defaulted Assets (because no collections have been received for thirty-two consecutive days) . . . However, due to the way in which this practice [of grace days] has been implemented in [CAN Capital's] information systems, Assets subject to a grace period have not been properly reclassified as Defaulted Assets . . . resulting in reporting errors."

36. Due to the removal of approximately $9 million in accounts with improper usage of grace days, the securitization failed its overcollateralization test by approximately $8.5 million, and investors had no further recourse to seek from CAN Capital to deposit sufficient eligible receivables to meet its overcollateralization test.

37. As a result of the rapid amortization, as the remaining assets in the securitization failed to perform as expected, CAN Capital was no longer required to replace them. Although the Class A noteholders were repaid in full, the cash flow from these assets is insufficient to pay off all noteholders in full, and as a result, investors in the Class B notes suffered losses exceeding $7 million.

## CLAIM FOR RELIEF

### Violations of Securities Act Sections 17(a)(2) and (3)

38. Paragraphs 1 through 37 are re-alleged and incorporated by reference as if fully set forth herein.

39. Defendant, directly or indirectly, singly or in concert, in the offer or sale of securities and by use of the means or instruments of transportation or communication in interstate commerce or the mails, at least negligently, has: (i) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon purchasers of securities; and (ii) obtained money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in

light of the circumstances under which they were made, not misleading.

40. By reason of the foregoing, Defendant, directly or indirectly, singly or in concert, has violated and, unless enjoined, will again violate Securities Act Sections 17(a)(2) and (3) [15 U.S.C. §§ 77q(a)(2) and (3)].

## PRAYER FOR RELIEF

**WHEREFORE**, the Commission respectfully requests the Court enter a Final Judgment:

### I.

Permanently enjoining CAN Capital and its officers, agents, servants, employees and attorneys and all persons in active concert or participation with any of them from violating, directly or indirectly, Securities Act Sections 17(a)(2) and 17(a)(3) [15 U.S.C. §§ 77q(a)(2) and (3)].

## II.

Granting any additional relief the Court deems just, appropriate, or necessary.

Dated:  New York, New York
        May 4, 2020

Respectfully submitted,

By: _____
Daniel Michael
Osman Nawaz*
Richard Hong
William Finkel
Joshua Brodsky
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
Brookfield Place
200 Vesey Street, Suite 400
New York, New York 10281-1022
(212) 336-0956 (Hong)
HongR@sec.gov

*Not admitted in SDNY